Natalie J. PALETSKY, Individually and as Administratrix of the Estate of Vincent E. Paletsky, Deceased, Plaintiff,

v.

John E. FARRELL, Trustee, The Central Railroad Company of New Jersey, Defendant.

Civ. A. No. 70–426.

United States District Court,
M. D. Pennsylvania.

March 1, 1972.

Nogi, O'Malley & Harris, Scranton, Pa., Arnold B. Elkind, New York City, for plaintiff.

Warren, Hill, Henkelman, & McMenamin, Scranton, Pa., for defendant.

## OPINION

MUIR, District Judge.

This matter is before the Court on Plaintiff's motion pursuant to F.R.Civ. P. 50 for judgment in her favor.

This is a suit brought under the Federal Employers Liability Act[1] by the widow of Vincent J. Paletsky, who at the time of his death on November 28, 1969, was a brakeman employed by the Defendant and assigned to the Allentown Yard. Trial of this case was bifurcated, and the issues of negligence and causation were submitted to the jury in the liability phase[2] of the trial on the following special interrogatories:

"(1) Was the defendant, The Central Railroad Company of New Jersey, negligent? Answer 'Yes' or 'No.'

1. 45 U.S.C. § 51 et seq.

2. Because of the jury's inability to agree on the question of causation, the issue of damages has not yet been tried.

"(2) If you find that the defendant was negligent, was this negligence a cause in whole or in part of the accident? Answer 'Yes' or 'No.' ————.''

The jury returned the answer "Yes" to the first question but was unable to agree to an answer to the second question.

After the jury returned but before the jury was discharged, the Plaintiff moved for a directed verdict with respect to the second question. Decision was reserved on Plaintiff's motion, and the jury was discharged. Plaintiff filed the instant motion for judgment pursuant to F.R.Civ.P. 50(b), which authorizes such a motion where the jury fails to return a verdict.

A motion for judgment n. o. v. may be entertained only if the movant has made a motion for a directed verdict "at the close of all the evidence." F.R. Civ.P. 50(b); 5A Moore's Federal Practice, ¶50.08. That the same is true where no verdict is returned is the clear implication of the following provision of F.R.Civ.P. 50(b):

". . . if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment *in accordance with his motion for a directed verdict.*" (Emphasis supplied.)

In this case, Plaintiff presented no motion for a directed verdict until after the jury had deliberated for several hours. Under Rule 50(b), therefore, this Court need not now entertain the instant Motion for Judgment.

We believe, however, Plaintiff is entitled to a ruling on the merits.

It is well-settled that in deciding this motion we must view the evidence in the light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences which might be drawn therefrom, without weighing the credibility of the witnesses. 5A Moore's Federal Practice, ¶50.02(1); Gizzi v. Texaco, Inc., 437 F.2d 308, 310 (3d Cir. 1971); Denneny v. Siegel, 407 F.2d 433 (3d Cir. 1969). The test applicable to the evidence so viewed is whether "there can be but one reasonable conclusion as to the verdict." Brady v. Southern Railway Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); Woods v. National Life and Accident Insurance Co., 347 F.2d 760 (3d Cir. 1965).

The essential facts are largely undisputed:

At about 3:00 P.M. on the afternoon of November 28, 1969, a crew of five employees of the Central Railroad of New Jersey, including Vincent Paletsky, reported to work at the Allentown Railroad Yard. Between 8:00 and 8:30 P.M. the crew began an assignment on Track #4 which entailed "making up" a train of 35 cars by coupling the cars together. The Yard was dark. In order to synchronize the movements of the engine and the operations involved in hitching the cars, the crew signalled with standard railroad lanterns. Steven Van Gorder was the "hind man" or rear brakeman of the train which was in the process of being made up. Vincent Paletsky was "head man," or the brakeman closest to the engineer. Sometime before the last hitch was made, completing the train, Van Gorder climbed to the roof of one of the hindmost of the 35 cars on Track #4 to pass signals to Paletsky, stationed on the roof of a car six or eight cars from the engine, who in turn relayed the signals to the engineer. There was some testimony that at the same time the Central crew was working on Track #4, a Reading crew was carrying out coupling operations on the adjacent Track #5; there was also testimony that while the Central crew was working on Track #4 there was no movement of the cars on Track #5. At approximately 8:45 P.M., when the Central crew had completed the coupling operations on Track #4, Van Gorder passed a back-up signal for the last hitch to be made to Charles Schweibinz, a Cen-

tral car inspector, who, from his position on the ground between Van Gorder and Paletsky, relayed the signal to Paletsky, who had climbed onto the center running board on the roof of a box car five or six cars behind the yard engine. The train moved backward and the last hitch was made. Schweibinz saw Paletsky's light on the roof of the box car move toward him and concluded that Paletsky had moved from the roof of the box car to the next car, a coal hopper. The completed train on Track #4 with Paletsky riding on the top of one of its coal cars, was drawn in an easterly direction toward the air hoses, where the air brakes on each car are activated by filling the train's brake system with air under pressure. As the train moved into the curve in Track #4, Schweibinz's view of Paletsky's light atop the train was obscured by cars on Track #3. The crew later moved to Track #6 to couple some cars. Finishing the move on Track #6, the conductor, Mike Glogowski, and the hind man Van Gorder noticed that Paletsky was missing, and Van Gorder crossed over to Track #4 to search for him. Walking back along Track #4 with his lantern, Van Gorder found Paletsky's cap, containing hair and part of Paletsky's skull. With Glogowski, Van Gorder continued his search and found Paletsky's body between the rails of Track #4 under the eighteenth car counting from the east end of the train. The body was in a "crouched" position. The head was against the north rail and was mutilated. An inspection of the train the following morning revealed blood or flesh on the wheels on the north side of each car east of the eighteenth car to the seventh car from the engine. The seventh car from the east end of the train was a loaded coal hopper. Blood and flesh were found on the wheels on the north side on the east end of that car. The sixth car was a fully loaded coal hopper. No blood or flesh was found on the wheels of that car, but there was flesh on the end sill of the car. There were marks which "looked like footprints" on the top of the load of coal at the north side of the hopper.

■ The Plaintiff's theories of liability were two: (1) that because the tracks were close together and there was a train on Track #5, in order to relay signals to coordinate the coupling activities, it was necessary for Paletsky to climb up on one of the cars, and that the top of a moving railroad car without individual air brakes as used in the operations being carried out in the Allentown Yard that night was an unsafe place to work; and (2) that the Railroad's negligence in this case consisted in carrying out coupling operations on Track #4 while identical operations were being carried out by a Reading crew on Track #5, a practice which resulted in a confusion of the signals between the two trains and that Paletsky was thrown off balance by the resultant unanticipated movements of the train.

The jury found that the Railroad was negligent in some respect but was not asked to specify their theory of negligence. The Plaintiff argues that, whatever theory or theories of negligence the jury might have adopted, the only reasonable conclusion is that the negligence of the Railroad was a cause of Paletsky's death.

However, if the jury or some of the jurors found that the practice of carrying out identical operations on adjacent tracks at night was a negligent practice because of the risk of confusing the two crews' signals but found that the Railroad by assigning Paletsky to a job requiring him to take a position on top of moving Railroad cars without operative air brakes did not thereby breach its duty to furnish him a safe place in which to work, it was still possible for them to find that the Plaintiff had not sustained her burden to show a causal connection between such negligence and Paletsky's death.

I am unable to conclude from the evidence in this case, viewed in the light most favorable to the Defendant, that "there can be but one reasonable conclusion", on the issue of causation, that the Railroad's negligence, on the Plaintiff's second theory, was a cause "in whole or in part," [3] of Paletsky's death.

Although there was testimony [4] that the practice of making up trains at night on adjacent tracks at the Allentown Yard by different crews was unsafe because of the risk that the engineer of one train might mistake signals of the other crew as signals of his own crew, there was no testimony from which an inference could be drawn that there was any confusion of signals on the part of the Defendant's engineer.

There was testimony [5] that the couplings on Track #5 had been completed and that the Reading train on Track #5 had moved from the vicinity of Paletsky's train on Track #4 prior to the time when Paletsky was last observed relaying signals to the engineer of his train. Taking this testimony in the light most favorable to the Defendant, it is reasonable to infer, therefore, that no confusion of the signals between the Reading train on Track #5 and the Defendant's train on Track #4 could have caused Paletsky's death. Paletsky was still alive after the risk of confusion of signals had ceased to exist.

For these reasons, the Plaintiff's motion for judgment will be denied.

■ After careful consideration of Plaintiff's request that an appeal be certified pursuant to 28 U.S.C. § 1292(b), that request will be denied for the reason that I am unable to say that the order disposing of Plaintiff's motion for judgment "involves a controlling question of law as to which there is substantial ground for difference of opinion," as required by § 1292(b) for such a certification.

3.  45 U.S.C. § 51.

4.  2 N.T. 39.